# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

MATTHEW DUSTIN ABREGO,    )
                                 )
           **Petitioner,**       )
                                 )
v.                             )     **Case No. 11-CV-0195-CVE-TLW**
                                 )
ANITA TRAMMELL, Warden,[1]   )
                                 )
          **Respondent.**     )

## OPINION AND ORDER

Before the Court is the amended petition for writ of habeas corpus (Dkt. # 8) filed by Petitioner Matthew Dustin Abrego, a state prisoner appearing pro se. Respondent filed a response (Dkt. # 11) and provided the state court record necessary for resolution of Petitioner's claims (Dkt. # 13). Petitioner filed a reply (Dkt. # 18). For the reasons discussed below, the amended petition for writ of habeas corpus is denied. The original petition (Dkt. # 1) shall be declared moot.

## *BACKGROUND*

On Sunday, July 29, 2007, Kris Simmons, Michael Watson, and Petitioner met at the apartment of Jill Oomen, located in Tulsa, Oklahoma. Once there, Petitioner, Simmons, Watson, and Oomen "shot up" methamphetamine, or meth. After a short discussion, Simmons got up to leave to get more drugs or money, but Petitioner and Simmons began fighting. Watson joined the fight for a short period of time. Simmons was knocked unconscious and Petitioner put Simmons into the bathroom just off the entry way to the apartment and closed the door. Oomen left the

---

[1]Petitioner is currently in custody at the Oklahoma State Penitentiary, in McAlester, Oklahoma. Pursuant to Rule 2(a), <u>Rules Governing Section 2254 Cases in the United States District Courts</u>, Anita Trammell, Warden, is the proper respondent. Therefore, Anita Trammell, Warden, is hereby substituted as the respondent in this case. The Court Clerk shall be directed to note such substitution on the record.

apartment. Eventually, Simmons was taken to the upstairs bathroom and left unattended for an undetermined amount of time.

Oomen returned to the apartment and heard a noise upstairs. She found Simmons lying on the floor, covered in blood and his head swollen. Oomen went outside her apartment and called several people for help. She did not call 911. As she was standing outside, Jason Bauder, a friend of Oomen, saw her standing on the sidewalk and, when he approached her, she asked for his help. Soon after, Brian Masingale and John Slater arrived at Oomen's apartment. Masingale was one of the people Oomen called for help. Masingale and Slater went upstairs and found Simmons lying on the floor, making grunting and gurgling sounds. As they prepared to move Simmons' body, they noticed he was not breathing well and his body was becoming stiff.

Masingale and Slater carried Simmons down the stairs and out to the parking lot in front of Oomen's apartment, where they loaded him into the trunk area of Oomen's SUV. Simmons was not conscious. Bauder drove Simmons to the emergency room at Saint Francis Hospital in Tulsa, Oklahoma. The next day, Simmons died from his injuries. The cause of death was brain swelling caused by blunt force trauma.

Petitioner was charged by Second Amended Information in Tulsa County District Court Case No. CF-2007-4036, with Murder - First Degree. (Dkt. # 13, Tr. Oct. 7, 2008 at 55-56). A jury found Petitioner guilty of Second Degree Murder and recommended a sentence of life imprisonment and a $10,000 fine. (Dkt. # 13-6, Tr. Vol. VI at 1629). The trial court sentenced Petitioner in accordance with the jury's recommendation. (Dkt. # 11-4). Attorney Kevin Adams represented Petitioner at trial.

Petitioner, represented by attorneys Sandra Mulhair Cinnamon and Kathleen M. Smith, perfected an appeal to the Oklahoma Court of Criminal Appeals (OCCA). (Dkt. # 11-1). He raised the following seven (7) propositions of error:

Proposition I:        The evidence was insufficient to prove beyond a reasonable doubt that Mr. Abrego committed the crime of second degree murder.

Proposition II:        Mr. Abrego was denied due process of law by the State's intentional use of perjured testimony.

Proposition III:        The admission of irrelevant, and highly prejudicial evidence deprived Mr. Abrego's [sic] of his rights to a fair trial under the Fourteenth Amendment to the United States Constitution and Article II, §§ 7 and 9 of the Oklahoma Constitution.

        A.      Evidence of the fight between Mr. Abrego and Mr. Watson.
        B.      The trial court erred in admitting Erin MacKool's testimony that Mr. Abrego pointed a gun at her.

Proposition IV:        The introduction of irrelevant and highly prejudicial photographs deprived Mr. Abrego of a fair trial.

Proposition V:        The improper tactics and arguments of the prosecutor deprived Mr. Abrego of a fair trial in violation of the Eighth and Fourteenth Amendments of the United States Constitution and Article II, §§ 7 and 9 of the Oklahoma Constitution.

Proposition VI:        Mr. Abrego received ineffective assistance of counsel in violation of the Sixth Amendment of the United States Constitution and Article 2, Section 20 of the Oklahoma Constitution.

Proposition VII:        The accumulation of error in this case deprived Appellant of due process of law and necessitates reversal pursuant to the Fourteenth Amendment to the United States Constitution and Article II, § 7 of the Oklahoma Constitution.

Id. In an unpublished Summary Opinion, filed April 8, 2010, in Case No. F-2008-1073, the OCCA affirmed Petitioner's judgment and sentence. (Dkt. # 11-4).

On April 4, 2011, Petitioner filed his petition for writ of habeas corpus (Dkt. # 1). In an Order dated August 24, 2011, this Court determined the petition was a "mixed petition" and ordered Petitioner to file an amended habeas petition to delete the unexhausted claims or risk dismissal of the petition. (Dkt. # 7). On September 12, 2011, Petitioner filed an amended petition. (Dkt. # 8). In the amended petition, Petitioner raises four (4) grounds for relief,

Ground I: Mr. Abrego was denied due process of law by the State's intentional use of perjured testimony.

Ground II: The introduction of irrelevant and highly prejudicial photographs deprived Mr. Abrego of a fair trial.

Ground III: Ineffective assistance of counsel, thereby denying Mr. Abrego his right to a fair trial and violating his 6th Amendment Rights and Art. 2, Sec. 20 Oklahoma Constitution.

Ground IV: Insufficient evidence to prove beyond a reasonable doubt that Mr. Abrego was guilty of 2nd Degree Murder.

Id. Respondent argues that the OCCA's decisions on Grounds I, III, and IV were not contrary to, or an unreasonable application of, federal law as determined by the Supreme Court. (Dkt. # 11). Respondent also argues that Ground II is a matter of state law not cognizable on habeas review and Petitioner was not deprived of a fair trial. Id.

## *ANALYSIS*

**A.     Exhaustion/Evidentiary hearing**

As an initial matter, the Court must determine whether Petitioner meets the exhaustion requirements of 28 U.S.C. § 2254(b). See Rose v. Lundy, 455 U.S. 509, 510 (1982). Petitioner fairly presented his habeas claims to the OCCA on direct appeal. Therefore, he has exhausted his state court remedies. In addition, Petitioner has not met his burden of proving entitlement to an

evidentiary hearing.  See Williams v. Taylor, 529 U.S. 420 (2000); Miller v. Champion, 161 F.3d 1249 (10th Cir. 1998).

**B.      Claims adjudicated by the OCCA**

The Antiterrorism and Effective Death Penalty Act (AEDPA) provides the standard to be applied by federal courts reviewing constitutional claims brought by prisoners challenging state convictions.  Under the AEDPA, when a state court has adjudicated a claim, a petitioner may obtain federal habeas relief only if the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  See 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 386 (2000); Neill v. Gibson, 278 F.3d 1044, 1050-51 (10th Cir. 2001).  "Clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of [the Supreme Court's] decisions."  White v. Woodall, 134 S. Ct. 1697, 1702 (2014) (citations omitted).

When a state court applies the correct federal law to deny relief, a federal habeas court may consider only whether the state court applied the federal law in an objectively reasonable manner. See Bell v. Cone, 535 U.S. 685, 699 (2002); Hooper v. Mullin, 314 F.3d 1162, 1169 (10th Cir. 2002).  An unreasonable application by the state courts is "not merely wrong; even 'clear error' will not suffice."  White, 134 S. Ct. at 1702 (citing Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003)).  The petitioner "'must show that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'"  Id. (quoting Harrington v. Richter, 131 S. Ct. 770, 786-87 (2011); see also Metrish v. Lancaster, 133 S. Ct. 1781, 1787 (2013)).

"When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Richter, 131 S. Ct. at 784-85. Section 2254(d) bars relitigation of claims adjudicated on the merits in state courts and federal courts review these claims under the deferential standard of § 2254(d). Id. at 784; Schriro v. Landrigan, 550 U.S. 465, 474 (2007). Here, the OCCA adjudicated Petitioner's claims on direct appeal. Therefore, the claims will be analyzed under the standards of § 2254(d).

### 1.    Use of perjured testimony (Ground I)

In Ground I, Petitioner argues he was denied due process of law when the State intentionally used perjured testimony to obtain his conviction. (Dkt. # 8 at 5). Petitioner claims the prosecutors knew or should have known the witnesses were "lying on the stand" because their testimony "contradicted one another[]." Id. Petitioner also argues that in closing arguments, "[t]he State picked out the parts of the witnesses['] testimony that could be used to convict, and downplayed the parts that were glaringly contradictory or self promoting." Id. at 8. Petitioner claims that "[a]llowing the State to convict Mr. Abrego on such testimony makes a mockery of our justice system, and it certainly denied him a fair trial and due process of law." Id. The OCCA denied relief stating that "[m]ere inconsistencies or conflicts among witness testimony will not support a claim that prosecutors used perjury to obtain a conviction." (Dkt. # 11-4 at 3). The OCCA concluded that the record did not support Petitioner's claim and that Petitioner failed "to establish that (1) certain testimony was misleading, (2) the prosecution knowingly used the testimony, and (3) it was material to guilt or innocence." Id. Respondent argues the OCCA's decision denying relief was "not

contrary to, nor based upon an unreasonable application of, clearly established federal law." (Dkt. # 11 at 6).

"[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." United States v. Agurs, 427 U.S. 97, 103 (1976); see also United States v. Wolny, 133 F.3d 758, 762 (10th Cir. 1998) (citing Giglio v. United States, 405 U.S. 150, 153 (1972) (citation omitted)). The relevant inquiry is whether (1) "the undisclosed evidence demonstrates that the prosecution's case includes perjured testimony"; (2) "the prosecution knew, or should have known, of the perjury"; and (3) "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." Agurs, 427 U.S. at 103; see also Giglio, 405 U.S. at 154 ("A new trial is required if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury.'" (quoting Napue v. Illinois, 360 U.S. 264, 271 (1959))).

In addition to testimony from medical personnel, police officers, and detectives, the State also presented ten witnesses who were at Oomen's apartment or with Petitioner on July 29, 2007. All of these witnesses had felony convictions and were, or had been, heavily involved in drugs, particularly meth. Their testimony was confusing, difficult to follow at times, and often contradictory to the testimony of at least one or two other witnesses. Petitioner argues that, in closing arguments, the prosecutor said these contradictions "only went to peripheral issues." (Dkt. # 8 at 8). On direct appeal, Petitioner also argued that the State used this testimony "with full knowledge of its potential for falsity." (Dkt. # 11-1 at 20).

In his reply brief, Petitioner argues that the prosecutor "stated during the trial that the witnesses['] credibility was for the jury to judge, and that 'some of the witnesses may not even be completely truthful, when on the witness stand.'" (Dkt. # 18 at 1). Petitioner claims "this statement alone . . . tell[s] us that the State knew that the witnesses were going to give false statements on the stand[.]" Id. Petitioner goes on to argue that the witnesses "contradicted one another to such an extent that no-one could possibly determine what was true and what was fabricated to clear themselves of any blame." Id. at 1-2. Petitioner claims that the witnesses "were hoping that their own sentences, or charges, would be reduced or dropped 'by request of the State.' And in fact, their charges were reduced or dropped." Id. at 2.

During opening statements, the prosecutor told the jury, "[e]ach witness that [the State] bring[s] up here is not going to be winning citizen of the month. They're all convicted felons, most of them." (Dkt. # 13, Tr. Oct. 7, 2008 at 61). He went on to say, "[y]ou'll hear how they weren't initially all that cooperative with the homicide detectives. To this day, some still aren't all that cooperative. It's the lifestyle they're living and still living, some of them. They . . . tried to mitigate, tried to reduce their involvement or knowledge they had about what happened." Id. at 62. The prosecutor also told the jury, "this is not a pretty case. . . . It's an ugly case, a difficult case. I'm going to be asking you all to listen to those witnesses. . . . Some of them may not even be completely truthful when they're on that witness stand as to what their exact involvement was or what they exactly witnessed that day." Id. at 64. The prosecutor also told the jury, "[t]hey're going to be for you to judge whether or not they're coming in here, taking the stand, and being truthful or credible as to what they knew that went on in the apartment that day. And as to what [Petitioner]'s actions were in the apartment that day." Id. at 62.

After a review of the record, the Court finds that the OCCA's decision was not contrary to, or an unreasonable application of, federal law as determined by the Supreme Court. While the record does support a claim that the prosecutor knew it was possible that certain witnesses may be untruthful on the stand, the record does not support Petitioner's claim that the prosecutor knowingly presented perjured testimony. It is well established that "the mere use of perjured testimony without the prosecution's knowing it was perjured is not a denial of due process." Gay v. Graham, 269 F.2d 482, 486 (10th Cir. 1959); see also Agurs, 427 U.S. at 103. There is no evidence in the record that the prosecutor deliberately deceived the court and jury, and in fact knew he was presenting false testimony. See Mooney v. Holohan, 294 U.S. 103, 112 (1935). The prosecutor openly informed the trial court, the jury, and defense counsel there was a possibility that some of the witnesses would not be completely truthful on the witness stand. There is no evidence in the record of any attempt by the prosecutor to suppress or conceal evidence that a witness was giving false testimony, made untruthful statements to police, or was motivated by a hope that testifying against Petitioner would mitigate current criminal charges and terms of imprisonment. Nor did the prosecutor raise many objections during cross-examination when defense counsel probed past inconsistent statements, suggested the witness was lying on the stand, and made other attempts to impeach witness credibility. Petitioner fails to show the prosecutor intentionally placed a witness on the stand knowing their testimony was false.

Further, Petitioner fails to identify which witnesses gave perjured testimony. Petitioner's only claim is that the contradictions among the testimonies of the State's witnesses prove the witnesses were lying. Contradictions among the testimonies of different witnesses alone are not sufficient to show the prosecutor knowingly presented perjured testimony. See, e.g., Campbell v.

Greene, 440 F. Supp. 2d 125, 147 (N.D.N.Y. 2006) (summary of cases); see also Price v. Giles, 2009 WL 607422, at *4 n.7 (M.D. Ala. Mar. 6, 2009) (unpublished).[2] Petitioner's claim that "no-one could possibly determine what was true and what was fabricated" is not sufficient to show the prosecutor knowingly used perjured testimony to obtain Petitioner's conviction. Because Petitioner fails to show that the prosecutor knowingly used perjured testimony, he fails to show that the OCCA's decision was contrary to, or an unreasonable application of, federal law as determined by the Supreme Court. 28 U.S.C. § 2254(d). Habeas relief is denied on Ground I.

## 2. Admission of highly prejudicial evidence (Ground II)

In Ground II, Petitioner claims that the State's use of highly prejudicial evidence "inflamed the jury against [him]" and deprived him of a fair trial. (Dkt. # 8 at 6). Petitioner complains that the trial court permitted the state to "display[] life-size, post-mortem photographs on poster boards to the jury." Id. Petitioner argues these photographs proved only that the victim "had died" and "resulted in the jury being inundated with images of [the victim's] swollen and bruised body." Id. at 6, 8. Petitioner argues the photos "were insufficient to prove that [Petitioner]'s involvement in [the victim's] beating was sufficient to cause the physical condition of [the victim] in the photographs." Id. at 9. Petitioner claims he was deprived of a fair trial because "[t]he jury was visibly shocked during this section of the trial [and] some appeared angry [and] were crying." (Dkt. # 18 at 3-4). The OCCA found that the trial court did not abuse its discretion when it admitted the photographs into evidence. (Dkt. # 11-4 at 4). Respondent argues that the "decision of whether to admit evidence is a state law issue," and this Court is limited to "determining whether 'the admission

---

[2]This and other unpublished court decisions are cited as persuasive authority, pursuant to Tenth Circuit Rule 32.1.

of the photographs rendered the proceedings fundamentally unfair.'" (Dkt. # 11 at 10) (citations omitted). Respondent argues the admission of the photographs did not deprive Petitioner of a fundamentally fair trial. Id. at 11.

Admissibility of evidence is an issue of state law. As a general matter, a federal habeas court has no authority to review a state court's interpretation or application of its own state laws. Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) (emphasizing that it is not the province of a federal habeas court to reexamine state court determinations on state law questions). "In a habeas proceeding claiming a denial of due process, 'we will not question the evidentiary . . . rulings of the state court unless [the petitioner] can show that, because of the court's actions, his trial, as a whole, was rendered fundamentally unfair.'" Maes v. Thomas, 46 F.3d 979, 987 (10th Cir. 1995) (quoting Tapia v. Tansy, 926 F.2d 1554, 1557 (10th Cir. 1991)); Revilla v. Gibson, 283 F.3d 1203, 1212 (10th Cir. 2002) (habeas relief only if the evidence was "so grossly prejudicial that it fatally infected the trial and denied the fundamental fairness that is the essence of due process"). "[W]e approach the fundamental fairness analysis with 'considerable self-restraint.'" Jackson v. Shanks, 143 F.3d 1313, 1322 (10th Cir. 1998) (quoting United States v. Rivera, 900 F.2d 1462, 1477 (10th Cir. 1990) (en banc)). A proceeding is fundamentally unfair under the Due Process Clause only if it is "shocking to the universal sense of justice." United States v. Russell, 411 U.S. 423, 432 (1973) (internal quotation omitted).

After reviewing the trial transcripts, the Court finds that the admission of these photographs did not render Petitioner's trial fundamentally unfair. Several witnesses for the State gave graphic descriptions of the physical appearance of the victim, both as Petitioner was beating him and after.

See, e.g., Dkt. # 13, Tr. Oct. 7, 2008[3] at 127-130, 137-141; Dkt. # 13-2, Tr. Vol. II at 438-442; Dkt. # 13-3, Tr. Vol. III at 589-592, 719-722; Dkt. # 13-4, Tr. Vol. IV at 823, 856-861, 914-915, 966-970. Some witnesses even said the photographs showed less blood than they remember seeing on the victim's face, upper torso, and clothing. Additionally, because several of the photographs were taken post-mortem, the prosecutor had the medical examiner explain the process of lividity, or blood settling in the body after death, allowing the jury distinguish between bruising or skin discoloration caused by injury versus discoloration resulting from lividity. (Dkt. # 13-4, Tr. Vol. IV at 1094-95). In light of the witnesses' repeated descriptions of the sights, sounds, and smells of the crime scene, the photographs were not unduly prejudicial and did not deprive Petitioner of a fundamentally fair trial.

The record also shows that defense counsel objected to the admission of three of the post-mortem photographs. (Dkt. # 13-3, Tr. Vol. III at 654). Counsel argued "one autopsy photograph is enough," and showing all three was "cumulative." Id. Though the court admitted the photographs over counsel's objection, the court postponed publication to the jury, allowing defense counsel additional time to present any case law that would prohibit their admission. Id. at 655. Nothing in the record suggests that defense counsel presented additional argument and, after the parties rested, the exhibits were admitted without objection. (Dkt. # 13-6, Tr. Vol. VI at 1528).

---

[3]The transcript of Petitioner's trial is contained within seven volumes and was reported by two court reporters, Sandy Crittenden and Kathryn Keeling. In the record before the Court, Volume I is the first day of trial and was reported by Crittenden. See Dkt. # 13-1. The next volume, chronologically, is identified as "Transcript of Proceedings on October 7, 2008," was not given a volume number, and was reported by Keeling. See Dkt. # 13. Crittenden resumed reporting on October 8, 2008, for the remainder of the trial and assigned volume numbers. See Dkt. # 13-2 – 13-6 (volumes II – VI). Thus, the seven volumes consist of Volume I, the volume for October 7, 2008, and Volumes II-VI.

The Court also notes that the record does not support Petitioner's claim that some jurors were crying or visibly shocked when shown the photographs. The jury saw numerous photographs of the crime scene and the victim's injuries and the trial transcript contains no mention of gasps or crying by the jurors.[4] Also, the trial judge did not adjourn after publication of the photographs to the jury. At one point, the trial judge admonished the jury regarding the potentially graphic nature of some photographs admitted during the examination of the medical examiner, see Dkt. # 13-4, Tr. Vol. IV at 1097-98, but those photographs are not the ones presently complained of by Petitioner.

After a review of the entire record, the Court finds nothing supports Petitioner's claim that the jury was visibly shocked or that members of the jury began crying after seeing the photographs. Thus, Petitioner fails to show he was deprived of a fundamentally fair trial when the trial court admitted these photographs. The Court finds that admission of the photographs is not "shocking to the universal sense of justice." Russell, 411 U.S. at 432. Having failed to show that he was deprived of a fundamentally fair trial, Petitioner is not entitled to habeas relief. Habeas relief on Ground II is denied.

## 3. Ineffective assistance of trial counsel (Ground III)

In Ground III, Petitioner claims his trial counsel was ineffective by failing to object to the "highly prejudicial photographs and to numerous instances of prosecutorial misconduct." (Dkt. #

---

[4]The trial transcript does reflect other sounds during the trial, including cell phones ringing. See, e.g., Dkt. # 13-4, Tr. Vol. IV at 869.

8 at 9).[5]  Petitioner claims that since his trial counsel was an experienced attorney, he "should have objected to each and every improper remark and piece of evidence."  Id.  Petitioner also claims that had his trial counsel "provided 'effective assistance' . . . the jury may well have determined that [Petitioner] was guilty of a lesser offense and/or that he deserved a lesser sentence than 45 years."  Id.  Petitioner raised this claim on direct appeal.  See Dkt. # 11-1 at 41.  The OCCA found that Petitioner failed to show he was prejudiced by counsel's performance and, for that reason, counsel did not provide ineffective assistance in failing to object. (Dkt. # 11-4 at 5).  Respondent argues this decision was "neither contrary to, nor based upon an unreasonable application of, clearly established federal law."  (Dkt. # 11 at 13).

To be entitled to habeas corpus relief on his claim of ineffective assistance of trial counsel, Petitioner must demonstrate that the OCCA's adjudication of his claim was contrary to, or an unreasonable application of, Strickland, 466 U.S. 668.  See 28 U.S.C. § 2254(d).  "For purposes of § 2254(d)(1), 'an unreasonable application of federal law is different from an incorrect application of federal law.'"  Richter, 131 S. Ct. at 785 (quoting Williams v. Taylor, 529 U.S. at 410 (O'Connor, J. concurring)).  "Under § 2254(d), a habeas court must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is

---

[5]The Court notes that Petitioner raises in his reply brief additional claims of ineffective assistance of trial counsel.  See Dkt. # 18.  Specifically, Petitioner claims his trial counsel "failed to prepare a case in mitigation for the penalty phase."  Id. at 5.  Petitioner states that he "believe[s] that the penalty phase would have concluded differently if additional mitigating evidence had been presented at trial."  Id.  Petitioner also lists several instances where counsel failed to object to alleged prosecutorial misconduct, failed to introduce certain pieces of evidence, and allegedly engaged in improper communication with Petitioner's family.  Id. at 6.  Because Petitioner did not raise these claims in his amended habeas petition, they are not properly before the Court.  See Thompkins v. McKune, 433 F. App'x 652, 659-60 (10th Cir. 2011) (unpublished) (citations omitted).  The Court also notes that some of these claims were not presented to the state courts and are unexhausted.

possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." Id. at 786. Section 2254(d) "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther." Id.

Strickland sets out a two-pronged standard for review of ineffective assistance of counsel claims. A defendant can establish the first prong by showing that counsel performed below the level expected from a reasonably competent attorney in criminal cases. Strickland, 466 U.S. at 687-88. There is a "strong presumption that counsel's conduct falls within the range of reasonable professional assistance." Id. at 688. In making this determination, a court must "judge . . . [a] counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Id. at 690. Moreover, review of counsel's performance must be highly deferential. "[I]t is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." Id. at 689.

To establish the second prong, a defendant must show that this deficient performance prejudiced the defense, to the extent that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694; see also Sallahdin v. Gibson, 275 F.3d 1211, 1235 (10th Cir. 2002); Boyd v. Ward, 179 F.3d 904, 914 (10th Cir. 1999). "The likelihood of a different result must be substantial, not just conceivable." Richter, 131 S. Ct. at 792. This Court's review of the OCCA's decision on ineffective assistance of counsel claims is "doubly deferential." Cullen v. Pinholster, 131 S. Ct. 1388, 1403 (2011) (noting that a habeas court must take a "highly deferential" look at counsel's performance under Strickland and

through the "deferential" lens of § 2254(d)). Under Strickland, Petitioner "must show that 'counsel's errors were so serious as to deprive [him] of a fair trial, a trial whose result is reliable.'" Byrd v. Workman, 645 F.3d 1159, 1168 (10th Cir. 2011) (quoting Strickland, 466 U.S. at 687). Petitioner fails to make such showing.

### a. Failure to object to admission of photographs

The record fails to support Petitioner's claim that counsel should have objected to the admission of photographs. As discussed above, Petitioner's trial counsel did raise an objection to the admission of the photographs. The trial court overruled the objection, but allowed Petitioner's counsel additional time to research case law supporting his objection before publishing the photographs to the jury. Trial counsel did not present any additional argument and the court admitted the photographs without objection. (Dkt. # 13-6, Tr. Vol. VI at 1528). Nothing in the record shows the OCCA's decision denying relief runs afoul of Strickland.

### b. Failure to object to prosecutorial misconduct

Petitioner's remaining claim is that counsel provided ineffective assistance in failing to object to instances of prosecutorial misconduct. On direct appeal, Petitioner raised a separate claim of prosecutorial misconduct, alleging that the prosecutor: (1) knowingly allowed perjured testimony; (2) belittled defendant and defense counsel; (3) vouched for the credibility of witnesses; (4) raised societal alarm; (5) introduced photographs to inflame the jury; and (6) improperly called for "justice." See Dkt. # 11-1 at 36-40. Because trial counsel failed to object to the alleged prosecutorial misconduct, the OCCA reviewed for plain error and found none. (Dkt. # 11-4 at 4-5). The OCCA then concluded that Petitioner's trial counsel was not ineffective for failing to object to

prosecutorial misconduct.  Id. at 5.  To be entitled to habeas relief, Petitioner must show that this decision was contrary to, or an unreasonable application of, Strickland.

"Prosecutorial misconduct can result in constitutional error if it 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" DeRosa v. Workman, 679 F.3d 1196, 1222 (10th Cir. 2012) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)). "[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned." Darden v. Wainwright, 477 U.S. 168, 181 (1986) (internal quotation marks omitted). "The ultimate question is whether the jury was able to fairly judge the evidence in light of the prosecutors' conduct." Bland v. Sirmons, 459 F.3d 999, 1024 (10th Cir. 2006).  To determine whether a trial is rendered fundamentally unfair, the Court examines the entire proceeding, "including the strength of the evidence against the petitioner, both as to guilt at that stage of the trial and as to moral culpability at the sentencing phase," as well as "[a]ny cautionary steps – such as instructions to the jury – offered by the court to counteract improper remarks." Le v. Mullin, 311 F.3d 1002, 1013 (10th Cir. 2002).  "To view the prosecutor's statements in context, we look first at the strength of the evidence against the defendant and decide whether the prosecutor's statements plausibly could have tipped the scales in favor of the prosecution." Fero v. Kerby, 39 F.3d 1462, 1474 (10th Cir. 1994) (quotations omitted); see also Smallwood v. Gibson, 191 F.3d 1257, 1275-76 (10th Cir. 1999).

### (1)  Knowingly presenting perjured testimony and introducing photographs to inflame the jury

As discussed above, Petitioner fails to show that the State knowingly presented perjured testimony or that the OCCA's decision denying relief on this claim was contrary to or an unreasonable application of federal law.  Also discussed above, admission of the photographs did

17

not result in a fundamentally unfair trial. Additionally, counsel did raise an objection to their admission. In light of the foregoing discussion, Petitioner's trial counsel cannot be found to be ineffective for failing to object to conduct not found to be improper. Therefore, the Court concludes that these two claims of ineffective assistance of counsel are without merit.

(2)     <strong>Attacks on defense counsel</strong>

On direct appeal Petitioner complained that during closing arguments, the prosecutor "belittle[d] the defense, defense counsel, and cause[d] the jury to despise and fear [Petitioner]." (Dkt. # 11-1 at 36). Petitioner claims his defense counsel should have objected to these comments and had he done so, the outcome of his trial or sentencing would have been different. (Dkt. # 8 at 9). Respondent argues this claim is without merit and the comments were "invited by defense counsel's repeated characterization of the State as all-powerful and his characterization of the State's witnesses as thoroughgoing liars." (Dkt. # 11 at 19-20).

"Attacks on defense counsel can at times constitute prosecutorial misconduct." Wilson v. Sirmons, 536 F.3d at 1119 (citing United States v. Young, 470 U.S. 1, 9 (1985) (counsel "must not be permitted to make unfounded and inflammatory attacks on the opposing advocate.")). "The prosecutor is expected to refrain from impugning, directly or through implication, the integrity or institutional role of defense counsel." United States v. Bennett, 75 F.3d 40, 46 (1st Cir. 1996) (citing United States v. Boldt, 929 F.2d 35, 40 (1st Cir. 1991)). However, "it is permissible for the prosecution to comment on the veracity of a defendant's story . . . on account of irreconcilable discrepancies between the defendant's testimony and other evidence in the case." United States v. Kaufman, 485 F. App'x 313, 318 (10th Cir. 2012) (unpublished) (citing Bland, 459 F.3d at 1025). A prosecutor should not refer to the defendant as a liar unless such an assertion is based on reasonable inferences of the evidence presented a trial. United States v. Hernandez-Muniz, 170 F.3d

1007, 1012 (10th Cir. 1999); <u>United States v. Garcia-Guizar</u>, 160 F.3d 511, 520 (9th Cir. 1998); <u>see</u> <u>also</u> <u>United States v. Lopez-Medina</u>, 596 F.3d 716, 740 (10th Cir. 2010) ("[T]he cardinal rule of closing argument [is] that counsel must confine comments to evidence in the record and to reasonable inferences from that evidence.").

The first alleged attack on defense counsel occurred during the State's closing argument. The prosecutor, Lee Berlin, addressed Petitioner's testimony that his story about what happened on July 29, 2007, had not changed during the investigation and trial. (Dkt. # 13-6, Tr. Vol. VI at 1553-54). The prosecutor asked the jurors to compare the video of Petitioner's police interview with his trial testimony and decide if his story was the same. <u>Id.</u> The prosecutor then said,

> [Y]ou've seen Matt Abrego. He's been wearing these nice suits and ties and his hair is all nice and combed, and he's up here, ladies and gentlemen, using the Queen's English dropping hundred dollar words. That's a fraud, that's a fiction. Matt Abrego is the guy you saw on that video. Each one of those witnesses, his friends, the people he's hanging out with, that's the reflection of Matt Abrego.

<u>Id.</u> at 1554. After reviewing the record, the Court finds that these statements were not improper.

The remaining alleged attacks on defense counsel occurred during the State's rebuttal argument. For a better understanding of the context of the prosecutor's statements during rebuttal, it is necessary to review excerpts from defense counsel's closing arguments. Defense counsel opened his closing argument with a discussion on the meaning of the word "truth." <u>Id.</u> at 1560. He then addressed the testimony of Clayton Beers, a witness for the defense,[6] and questioned how the

---

[6]At Petitioner's trial, Beers told the jury that while in jail with Petitioner's co-defendant, Michael Watson, Watson told Beers that it was Watson who beat and killed Simmons. (Dkt. # 13-5, Tr. Vol. V at 1259). On cross-examination, the State attacked Beers' credibility. <u>Id.</u> at 1276-1277. On redirect, defense counsel pointed out that Beers gave the same testimony as a State's witness during the preliminary hearing, using it to support the State's case against Watson. <u>Id.</u> at 1278-80.

State could use Beers' testimony at the preliminary hearing against Watson, but accuse Beers of lying at Petitioner's trial. (Dkt. # 13-6, Tr. Vol. VI at 1562). Defense counsel then said,

> [T]hey want you to focus just on this, ignore the mind [sic] behind the curtain, put the blinders on, don't ask the tough questions, don't stand up, don't speak truth to power, authority. We're the State of Oklahoma. They represent the people of the State of Oklahoma, and we are the people of the State of Oklahoma. We have a government for the people, of the people, by the people. They are your representative.

Id. at 1563. Defense counsel told the jury, "[y]our job is to decide whether the State of Oklahoma has done its job. Has it proved beyond a reasonable doubt that [Petitioner] is guilty of every one of the elements of first degree murder?" Id. at 1568. Defense counsel then compared Petitioner to Jake Cain, one of the prosecutors, presumably pointing back and forth between the two men. Counsel stated,

> Mr. Cain, eighth grade education, highly educated. Okay? Never been in trial before, been through a ton of trials. Skilled in what he does; didn't make it to high school. You'll see Mr. Cain gets him to admit that there is an inconsistency between what he said in the video and what he said here about the black eye, but it's not. Watch the video. In all of his skill, Mr. Cain got Mr. Abrego to admit to an inconsistency that did not exist.

Id. at 1569-70.

During rebuttal argument, Mr. Cain began by discussing the importance of the jury instructions and the State's burden of proof. Id. at 1600. He stated,

> Whether you're disenchanted with the government and the President and politics and all these other things that are going on – yes, I work for the Tulsa County District Attorney's office and the State of Oklahoma. I represent victims of crime, and I represent the people of the State of Oklahoma. So if you want to put me and Mr. Berlin, kind of characterize us as the big, bad government who are trying to run roughshod over innocent people, then go ahead, but I'm telling you, that's not what I do. But in this case, you all get to decide if that's being done. In this case, you all get to decide if the big, bad government is trying to feed you all a load of crap.

Id. at 1600-01.  The prosecutor continued to discuss how crime does not discriminate, even when it involves convicted felons.  He then stated,

> Mr. Adams is – he's good at what he does.  He's a defense attorney for Matt Abrego.  He sits there an talks about how I'm good at what I do or I'm skilled, I'm highly educated, blah, blah, blah.  Okay.  I hope so.  This is what I do.  I'm not dealing with people who are out stealing people's newspapers off the front porch.  I'm dealing with people who kill people, and he defends them.  He's very highly educated.  He's very skilled.

Id. at 1606.  Near the end of his rebuttal argument, the prosecutor discussed the fact that the case "would not be given to [the jury] on a silver platter."  Id. at 1622.  He laid out his argument as to why the State believed Petitioner's role in Kris Simmons' death was "great."  Id.  He said,

> This whole bull about, oh, I just wanted to help him out, I just called him over here to talk to him about it, and all of sudden he starts talking to me about robbing another guy, and I'm just like, man, you can't rob people, you can't do shitty things to people.  That's not how it happened.

Id. at 1623.  The prosecutor then argued Petitioner intended to "tun[e] Kris up from the get go."  Id.  Petitioner's defense counsel did not object to any of these statements by the prosecutors.

After reviewing the record, the Court finds that these statements were not improper.  First, several comments were in direct response to defense counsel's closing argument and did not unduly prejudice the defendant.  See Young, 470 U.S. at 12 ("the remarks must be examined within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error").  Second, many of the statements were direct commentary on Petitioner's testimony.  Petitioner testified that Simmons came to Oomen's apartment in Tulsa to talk about his debt problem and Petitioner offered to help.  (Dkt. # 13-5, Tr. Vol. V at 1331; Dkt. # 13-6, Tr. Vol. VI at 1401, 1405).  Petitioner also testified that some of the State's witnesses "have told some truth and some downright lies."  (Dkt. # 13-6, Tr. Vol. VI at 1518).  However, since Petitioner's account of events and admitted level of involvement in the death of Simmons drastically differed from the testimony given

by the State's witnesses, statements regarding truth and lies in Petitioner's testimony were to be expected during closing arguments. See Hernandez-Muniz, 170 F.3d at 1012 (statements "perceived only as commentary on the implausibility of the defendant's story" are permissible); Mars v. Dinwiddie, 317 F. App'x 729, 732-33 (10th Cir. 2008) (unpublished). When viewed in the context of the entire case, the prosecutor's statements did not exceed the reasonable latitude allowed attorneys during closing arguments and did not prejudice Petitioner.

After reviewing Petitioner's claim that had trial counsel objected to these statements the outcome of his trial would have been different, the Court finds that Petitioner's claim has no merit. The prosecutor's comments did not deprive Petitioner of a fair trial or tip the scales in favor of the prosecution. Petitioner fails to show that the OCCA's ruling that defense counsel was not ineffective for failing to object to these statements by the prosecutor was contrary to, or an unreasonable application of, Strickland.

### (3) Raising societal alarm

On direct appeal, Petitioner complained that trial counsel should have objected when the prosecutor made a statement that raised societal alarm. (Dkt. # 11-1 at 37). Respondent argues that the prosecutor's comment was invited and "was arguably made in response to defense counsel's argument personally attacking the character of the State's witnesses." (Dkt. # 11 at 21-22). The OCCA found no plain error and found trial counsel was not ineffective for failing to object. (Dkt. # 11-4 at 5).

"While 'improper appeals to societal alarm' and requests for 'vengeance for the community to set an example' are unwarranted, they are also not the type of comments that the Supreme Court has suggested might amount to a due process violation." Brecheen v. Reynolds, 41 F.3d 1343, 1356 (10th Cir. 1994) (quoting Darden, 477 U.S. at 181-82); see also Wright v. Jones, 359 F. App'x 49,

54 (10th Cir. 2010) (unpublished).  Prosecutorial misconduct warrants federal habeas relief only if the conduct "is so egregious as to render the entire proceedings against the defendant fundamentally unfair."  Smallwood, 191 F.3d at 1275 (citing Donnelly, 416 U.S. at 642-48).

Petitioner points to a single comment at the conclusion of the State's rebuttal argument, where he alleges the prosecutor improperly evoked societal alarm.  As the prosecutor concluded the rebuttal argument, he asked the jury to examine the court's instructions, determine who was telling the truth, and hold Petitioner "accountable for his actions."  (Dkt. # 13-6, Vol. VI at 1625-26).  The prosecutor closed by stating,

> If you search your soul, you search your gut and you search your heart, and you don't believe the intent was there, then look at murder in the second degree, and you give him a sentence that is appropriate.  The question you should be asking is when do you want Matt Abrego coming home to Tulsa County.

Id. at 1627.  Petitioner points to a note from the jury[7] and argues that "the jury was terrified that [Petitioner] would get out of jail and come after them."  (Dkt. # 11-1 at 37, n.9).

When examining the prosecutor's statement in the context of the entire trial, the Court cannot say that the statement "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  Le, 311 F.3d at 1013.  The State presented several witnesses who testified that Petitioner unmercifully beat Kris Simmons on July 29, 2007.  The witnesses testified that Simmons was covered in blood, had gashes on his head, his eyes were swollen shut, and he was moaning, had difficulty breathing, and was unconscious several times.  In light of the evidence presented at trial, this comment by the prosecutor did not improperly raise societal alarm nor did it deprive Petitioner of due process.

---

[7]The actual note from the jury is not part of the record before this Court.  In his direct appeal brief, Petitioner stated the note from the jury read, "Can the jury select years to be imprisoned above life? 2nd Degree."  (Dkt. # 11-1 at 37, n.9).

Petitioner fails to show that but for counsel's failure to object to this statement, the outcome of his trial would have been different. Petitioner also fails to show the OCCA's decision was contrary to, or an unreasonable application of, Strickland.

**(4)    Improper vouching**

On direct appeal, Petitioner argued that the prosecutor improperly vouched for the credibility of the State's witnesses. (Dkt. # 11-1 at 38). The OCCA stated that "[a]lthough some of the prosecutor's remarks come close to the line of personal opinion, they do not rise to the level of plain error, as they neither resulted in a miscarriage of justice nor constitute a substantial violation of a constitutional or statutory right." (Dkt. # 11-4 at 4). The OCCA further found that trial counsel was not ineffective for failing to object. Id. at 5. Respondent argues that the prosecutor "was merely responding to defense counsel's extensive argument that the State's witnesses were liars involved in a grand conspiracy to frame [Petitioner]." (Dkt. #11 at 23). Respondent argues further that the comments were not improper because "the prosecutor did not provide the jury with explicit personal assurances of veracity of the witnesses, and did not imply that information not in evidence supported the testimony of State witnesses." Id.

Argument or evidence is permissible vouching unless "'the jury could reasonably believe that the prosecutor is indicating a personal belief in the witness' credibility, either through explicit personal assurances of the witness' veracity or by implicitly indicating that information not presented to the jury supports the witness' testimony.'" Thornburg v. Mullin, 422 F.3d 1113, 1132 (10th Cir. 2005) (quoting United States v. Magallanez, 408 F.3d 672, 680 (10th Cir.2005) (internal quotation marks omitted)); see also United States v. Bowie, 892 F.2d 1494 (10th Cir. 1990). A prosecutor's vouching for the credibility of witnesses can "jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury[,] and the prosecutor's opinion carries

with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." Young, 470 U.S. at 18-19 (citing Berger v. United States, 295 U.S. 78, 88-89 (1935)).  Yet, "[i]mproper vouching for witnesses is not considered to impact an express constitutional right." United States v. Harlow, 444 F.3d 1255, 1266 (10th Cir. 2006); Parker v. Scott, 394 F.3d 1302, 1310 (10th Cir. 2005).  A habeas court reviews such claim for a denial of due process and "'must find that the absence of [fundamental] fairness infected the trial [and] the acts complained of must be of such quality as necessarily prevents a fair trial.'"  Parker, 394 F.3d at 1310-11 (quoting Lisenba v. California, 314 U.S. 219, 236 (1941)).

Petitioner cites three instances where he believes the prosecutor impermissibly vouched for the credibility of State's witnesses.  All three instances occurred during the State's rebuttal argument.  First, the prosecutor told the jury that many of the witnesses, given their past felony convictions, were concerned they would be prosecuted if they said anything to the police.  (Dkt. # 13-6, Tr. Vol. VI at 1604).  He told the jury he was not making excuses for them and acknowledged the jury would have questions about such matters.  He continued,

> You're going to have questions, but do those questions in your mind rise to a reasonable doubt as to who killed, who beat, who stomped Kris Simmons to death? You would have to completely disregard every single one of them and think that those six people, those band of brothers and sisters[8] who some of them don't even know each other and who are in Department of Corrections all over the state of Oklahoma have somehow got this grand conspiracy to hang Matt Abrego out to dry for something he did not do.  And what's the benefit to them to come up with this grand conspiracy?  Mike Watson was the third person to talk to the homicide detectives.  He was arrested.  He sits in jail to this day charged with first degree murder.  I'm telling you, he will be going to prison one way or another.

---

[8]Petitioner complained of this statement in a footnote in his direct appeal brief.  He argued this statement, "band of brothers and sisters," was not a reasonable inference from the evidence and amounted to unprofessional conduct by the prosecutor.  (Dkt. # 11-1 at 38 n.10).  Petitioner does not raise this claim in his amended petition.

Id. at 1605.

After a review of the record, the Court finds that this statement was not improper and did not deprive Petitioner of a fair trial. During his closing argument, defense counsel repeatedly attacked the credibility of several of the State's witnesses and theorized that the witnesses coordinated their stories to place the blame on Petitioner. See, e.g., id. at 1564-68; 1570-73; 1587-91. Given the questionable credibility of these witnesses and defense counsel's attacks during closing arguments, it was not improper for the prosecutor to rebut defense counsel's claims. Moreover, the comments made by the prosecutor regarding an alleged conspiracy were proper inferences from the testimony and evidence; in other words, the jury would have had to disregard the testimony of six or more people, some of whom testified that they did not know each other, in order for defense counsel's conspiracy theory to carry weight. The Court finds these statements to be proper. Defense counsel did not perform deficiently in failing to object.

Second, the prosecutor told the jury it was possible that Petitioner "was just so unlucky that he [chose] to get in a fight with Kris Simmons on July 29th, 2007 . . . and then there is somebody who comes along . . . and decides . . . I'm just going to finish him off." Id. at 1609. Then that "somebody" conspired with all of the witnesses to say that Petitioner was the one who beat Simmons. Id. Citing the testimony of Detective Zenoni, the prosecutor then told the jury,

> I went through that testimony with Detective Zenoni for a reason, putting the puzzle pieces together. After you talked to this person, were you led down a different path? After you talked to this person, were you led down a different path? He already knew for the most part what had happened because Michael Watson told him on July 30, 2007, what happened in that apartment that day on July 29th. If I could show you that video of his statement, I would, but there is [sic] rules of evidence I must follow.

Id. at 1609-10.

The Court finds that the prosecutor improperly told the jury there was evidence outside the record to support the testimonies of Detective Zenoni and Michael Watson. Specifically, he told the jury, "[i]f I could show you that video of his statement, I would, but there is [sic] rules of evidence I must follow." (Dkt. # 13-6, Tr. Vol. VI at 1610). This comment allowed the jury to believe the prosecutor had information outside the record that supported the veracity of the witnesses' statements and it was impermissible vouching. Nonetheless, the statement did not affect the fairness of Petitioner's trial. The State's case did not rest entirely on the testimony of Michael Watson and his interview by Detective Zenoni. Additionally, the jury was instructed that closing arguments were not evidence and jurors could only consider evidence "received from the witnesses under oath, agreements as to the fact made by the attorneys, and the exhibits admitted into evidence during the trial." (Dkt. # 13, Tr. Oct. 7, 2008 at 51-52; 54). Petitioner fails to demonstrate that the outcome of his trial would have been different but for counsel's failure to object. Thus, Petitioner fails to show that the OCCA's decision was contrary to, or an unreasonable application of, Strickland.

Finally, near the end of his rebuttal argument, the prosecutor returned again to the alleged conspiracy theory. He told the jury,

> [T]his is not a grand conspiracy. In the world we live in . . . it makes for a great T.V. show, it makes for a great book. . . . But sometimes, a lot of times, here in the real world, things are just the way they are. It is what it is. Those five or six sophisticated people, they're so sophisticated they come in here and just hang Matt Abrego out to dry.
> And Jason Bauder? Do you think if I really thought there was – that he knew something more after I have met with him multiple times – I'm not looking to prosecute people who don't need to be prosecuted.

Id. at 1625-26.

The prosecutor's statement, "I'm not looking to prosecute people who don't need to be prosecuted" is questionable, but not a clearly improper statement. In Cargle v. Mullin, 317 F.3d

1196 (10th Cir. 2003), the prosecutor told the jury, "what in the world have I . . . or the D.A's Office or the police department got to gain by even trying to convict an innocent person?  It would destroy our credibility . . . We don't do these things."  Id. at 1218.  The Tenth Circuit stated, "it is always improper for a prosecutor to suggest a defendant is guilty merely because he is being prosecuted." Id. (citing Washington v. Hofbauer, 228 F.3d 689, 701-02 (6th Cir. 2000) (quoting United States v. Bess, 593 F.2d 749, 754 (6th Cir. 1979) (collecting cases)); Hopkinson v. Shillinger, 866 F.2d 1185, 1209 (10th Cir. 1989) (such suggestions are "particularly egregious"), aff'd 888 F.2d 1286 (10th Cir. 1989) (en banc), overruled on other grounds Sawyer v. Smith, 497 U.S. 227 (1990); Devine v. United States, 403 F.2d 93, 96 (10th Cir. 1968) (such suggestions "are to be deplored"); United States v. Splain, 545 F.2d 1131, 1134 (8th Cir. 1976) (such suggestions "have no place in a criminal trial"); Young, 470 U.S. at 18 (prosecutor's expression of personal opinion of guilt is improper)); see also Torres v. Mullin, 317 F.3d 1145, 1158 (10th Cir. 2003) (finding the statement "[d]o you think we're trying to prosecute somebody that's innocent?" to be improper, but did not render petitioner's trial fundamentally unfair); United States v. Shalash, 108 F. App'x 269, 281 (6th Cir. 2004) (unpublished) (finding "no place in a criminal trial" for a prosecutor telling the jury it spent hundreds of thousands of dollars investigating the case).  The Tenth Circuit further stated "prosecutorial arguments such as the one quoted above 'infringe upon the role of the jury as fact finder and determiner of guilt or innocence.  They amount to inadmissible and highly prejudicial evidence.'" Cargle, 317 F.3d at 1218 (citations omitted).  The Circuit did not find that this statement alone warranted habeas relief, but did state that it "offer[ed] substantial additional support for petitioner's claim of cumulative error."  Id.

Here, taking the statement by the prosecutor out of the context, a jury could reasonably believe either (1) the prosecutor was indicating a personal belief he was prosecuting the right person

or (2) there was evidence outside the record that supported Bauder's testimony and the prosecutor did not personally believe Bauder should be the one standing trial.[9]  It is arguable whether the prosecutor's statement equates to the one condemned in <u>Cargle</u>.  However, even if this Court found the statement, when taken out of context, to be improper, it did not affect the fairness of Petitioner's trial.  During closing argument, defense counsel questioned why the police let Bauder go after he arrived at the hospital with Simmons' beaten body and drugs in the vehicle.  Defense counsel suggested that Bauder, Masingale, and Slater played significant roles in the death of Kris Simmons.  (Dkt. # 13-6, Tr. Vol. VI at 1563-66).  Defense counsel's argument likely prompted the prosecutor's statement.  Additionally, when the prosecutor's statement is examined in full context[10] and in light of the evidence and testimony presented at trial, it did not deprive Petitioner of a fair trial.  Thus, even if Petitioner's counsel should have objected, Petitioner cannot show he was prejudiced by counsel's failure to object.  Petitioner also fails to demonstrate that the OCCA's decision was contrary to, or an unreasonable application of, federal law as determined by the Supreme Court.

---

[9]Jason Bauder drove Simmons to the hospital in Oomen's SUV, was temporarily detained and questioned by police, and allowed to leave.

[10]The full context of the statement by the prosecutor is as follows:

> And Jason Bauder?  Do you think if I really thought there was – that he knew something more after I have met with him multiple times – I'm not looking to prosecute people who don't need to be prosecuted.  Jason Bauder was high or he was coming down or he was craving.  He was freaked out by the whole situation.  He did prove, just like I said, to be the world's worst witness.  But is that – I mean, does [sic] his actions – he doesn't even know these other people.  Does that mean that we're just going to sit there and forget about David Carter, forget about Lillian Dewberry, forget about Jill Oomen, forget about Chico?  You have to completely forget about all of those people to think that [Petitioner] is not guilty of murder in the first degree, and I won't ever apologize.  I take my job seriously.  We're dealing with serious matters here, the death of a human and the future of another.

(Dkt. # 13-6, Tr. Vol. VI at 1626).

### (5) Calls for justice

Petitioner's final claim on direct appeal was that "the State just had to implore the jury to 'find some justice for Kris Simmons and do the right thing.'" (Dkt. # 11-1 at 39). The OCCA found that "[w]hile this Court has cautioned prosecutors against pleas for justice in closing argument, these isolated comments did not constitute plain error." (Dkt. # 11-4 at 5) (internal citations omitted). Respondent argues "the prosecutor did not suggest that the jury had a civic duty to convict, but only asked them, based upon the evidence presented at trial, to convict the Petitioner of the crime with which he was charged." (Dkt. # 11 at 25).

"It is improper for a prosecutor to suggest that a jury has a civic duty to convict." Thornburg, 422 F.3d at 1134; see also Malicoat v. Mullin, 426 F.3d 1241, 1256 (10th Cir. 2005). "Appeals to the jury's emotion or sense of vengeance 'call[ ] into question the integrity of the criminal justice system' by encouraging the jury to convict based on outrage, and not on the evidence." Wilson, 536 F.3d at 1120-21 (citations omitted). "This restriction 'is balanced, however, by the acknowledgement that in an emotionally charged trial, the prosecutor's closing argument need not be confined to such detached exposition as would be appropriate in a lecture.'" United States v. Fleming, 667 F.3d 1098, 1104 (10th Cir. 2011) (quoting United States v. Jones, 468 F.3d 704, 708 (10th Cir. 2006) (quotations omitted)). Further, if the "prosecutor's comments [are] firmly rooted in the facts of the case," the statements do not render the trial fundamentally unfair. Thornburg, 422 F.3d at 1134.

Petitioner complains of two instances where the prosecutors asked the jury for justice. During the State's closing argument, the prosecutor concluded his remarks by telling the jury, "[t]he State of Oklahoma is going to ask you to do – the twelve of you that go back and deliberate to do what . . . all those people did not do on July 29th, and that is to find some justice for Kris Simmons

and do the right thing." (Dkt. # 13-6, Tr. Vol. VI at 1559). Then, at the beginning of the State's

rebuttal, the prosecutor told the jury, "If you recall, I asked at the end of my opening, I said one good

that I would ask to come out of this is that Matt Abrego be held accountable for his actions and that

Kris Simmons receive justice." <u>Id.</u> at 1599. These two statements did not render Petitioner's trial

fundamentally unfair as they were rooted in the facts of the case. The witnesses at Oomen's

apartment admitted they did nothing to help Kris Simmons on July 29, 2007, and Petitioner admitted

that he had fought with Kris on July 29, 2007 and "whooped his ass." Asking the jury to "find some

justice" or to hold Petitioner accountable so that the victim could "receive justice," was not

improper. <u>See</u> <u>Thornburg</u>, 422 F.3d at 1134. Petitioner fails to show that had defense counsel

objected to these "calls for justice" that the outcome of his trial would have been different.

Petitioner thus fails to show that the OCCA's decision was contrary to, or an unreasonable

application of, <u>Strickland</u>.

In summary, after reviewing all of Petitioner's claims of prosecutorial misconduct, Petitioner

fails to show that, even where the prosecutor's statements were improper, the outcome of his trial

would have been different had defense counsel objected. As a result, Petitioner fails to satisfy the

second prong of <u>Strickland</u>. Petitioner also fails to show that the OCCA's decision denying relief

on Petitioner's claims of ineffective assistance of counsel was contrary to, or an unreasonable

application of, federal law as determined by the Supreme Court. 28 U.S.C. § 2254(d). Thus, habeas

relief on Ground III is denied.

### 4. Insufficient evidence to support Second Degree Murder (Ground IV)

In Ground IV, Petitioner argues there was insufficient evidence to support his conviction of

Second Degree Murder. (Dkt. # 8 at 9). He argues that "[t]he State did not prove that [Petitioner]

caused Mr. Simmons' fatal injuries. The State's case was based on perjured testimony and all

witness [sic] did have reason to lie."  Id.  On direct appeal, the OCCA found "that, taking the evidence in the light most favorable to the State, any rational trier of fact could find beyond a reasonable doubt that Abrego intended to and did beat, kick and stomp the victim, that these actions were imminently dangerous to and done with reckless disregard for human life, and caused the victim's death." (Dkt. # 11-4 at 2).  Respondent argues this decision was "neither contrary to, nor based upon an unreasonable application of, clearly established federal law." (Dkt. # 11 at 26).

In a habeas proceeding, the Court reviews the sufficiency of the evidence "in the light most favorable to the prosecution" and asks whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). "This standard of review respects the jury's responsibility to weigh the evidence and to draw reasonable inferences from the testimony presented at trial." Dockins v. Hines, 374 F.3d 935, 939 (10th Cir. 2004) (citing Jackson, 443 U.S. at 319). The Court "impinges upon 'jury' discretion only to the extent necessary to guarantee the fundamental protection of due process of law." Jackson, 443 U.S. at 319. The Court must "accept the jury's resolution of the evidence as long as it is within the bounds of reason." Grubbs v. Hannigan, 982 F.2d 1483, 1487 (10th Cir. 1993).

Petitioner was charged with First Degree Murder and convicted of Second Degree Murder, in violation of OKLA. STAT. tit. 21, § 701.8. (Dkt. # 11-4). Under Oklahoma law, a person is guilty of Second Degree Murder if a homicide results "[w]hen perpetrated by an act imminently dangerous to another person and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual." Id. at § 701.8(1). After reviewing the record, the Court concludes the evidence is sufficient to support Petitioner's conviction of Second Degree Murder. The testimony, when viewed in a light most favorable to the state, establishes the following facts: Petitioner fought with Kris Simmons in Jill Oomen's apartment

on July 29, 2007 (Dkt. # 13, Tr. Oct. 7, 2008 at 113; Dkt. # 13-2, Tr. Vol. II at 433; Dkt. # 13-3, Tr. Vol. III at 698-99; Dkt. # 13-5, Tr. Vol. V at 1332-35); Petitioner shot up meth with Simmons and Watson just prior to the fight (Dkt. # 13, Tr. Vol. Oct. 7, 2008 at 107; Dkt. # 13-3, Tr. Vol. III at 700; Dkt. # 13-5, Tr. Vol. V at 1331); witnesses saw and/or heard Petitioner punching, stomping, and beating Kris on the floor and in the downstairs bathroom of the apartment (Dkt. # 13, Tr. Vol. Oct. 7, 2008 at 113-120, 128; Dkt. # 13-2, Tr. Vol. II at 438; Dkt. # 13-3, Tr. Vol. III at 590, 701-07); witnesses saw Simmons bleeding from his head and face and heard him moaning and struggling to breathe (Dkt. # 13, Tr. Oct. 7, 2008 at 119, 137-141; Dkt. # 13-2, Tr. Vol. II at 439-441; Dkt. # 13-3, Tr. Vol. III at 589-592; 705-06, 719-22; Dkt. # 13-4, Tr. Vol. IV at 823-28, 856-861, 914, 966-975); witnesses said Petitioner continued to beat and kick Kris in the head, even when he was lying on the floor and it was obvious he was not fighting back (Dkt. # 13, Tr. Oct. 7, 2008 at 119, 127; Dkt. # 13-3, Tr. Vol. III at 703, 706-07); Petitioner was "amped up" and told witnesses he "whooped the shit out of Kris" and "you've got to keep an eye on me because sometimes I get carried away" (Dkt. # 13, Tr. Oct. 7, 2008 at 121; Dkt. # 13-2, Tr. Vol. II at 387, 432-33; Dkt. # 13-3, Tr. Vol. III at 707-08); Petitioner told witnesses that Kris "needed his tail whipped" because he was ripping people off (Dkt. # 13-2, Tr. Vol. II at 433, 591; Dkt. # 13-6, Tr. Vol. VI at 1407); and Petitioner told witnesses he thought he killed Kris (Dkt. # 13-2, Tr. Vol. II at 542).

"Jackson leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors 'draw reasonable inferences from basic facts to ultimate facts.'" Coleman v. Johnson, 132 S. Ct. 2060, 2064 (2012). Reviewing sufficiency of the evidence claims under the Jackson standard respects the jury's role and broad discretion in weighing evidence. Id.; Bates v. Workman, 311 F. App'x 125, 128 (10th Cir. 2009) (unpublished). This was not an easy case. Testimony lasted more than five days and there were numerous exhibits.

The credibility of several State's witnesses was a factor and the jury was required to sort through inconsistent and sometimes contradictory stories to determine what role Petitioner played in the death of Simmons and whether the State proved its case beyond a reasonable doubt. It is not for this Court, on habeas review, to evaluate witness credibility or question the jury's reasonable conclusion based on the record. Wingfield v. Massie, 122 F.3d 1329, 1332 (10th Cir. 1997).

Based on the foregoing, a jury could reasonable have inferred that Petitioner committed an imminently dangerous act, acting with a depraved mind, without any premeditated design to effect death. Petitioner admitted to fighting Kris, but said it was because he was mad Kris planned to rob a guy of $1,000 to pay some of his debts. The record also demonstrates that Petitioner did not have a premeditated plan to murder Kris. Thus, Petitioner fails to show that the OCCA's conclusion that "[e]vidence showed that [Petitioner] caused the death of a human by conduct imminently dangerous to another person, showing a depraved mind in extreme disregard of human life, and without the intent to take a particular life," was contrary to, or an unreasonable application of, Jackson. Habeas relief on Ground IV is denied.

## C.    Certificate of appealability

Rule 11, Rules Governing Section 2254 Cases in the United States District Courts, instructs that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Pursuant to 28 U.S.C. § 2253, the court may issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," and the court "indicates which specific issue or issues satisfy [that] showing." A petitioner can satisfy that standard by demonstrating that the issues raised are debatable among jurists, that a court could resolve the issues differently, or that the questions deserve further proceedings. Slack v. McDaniel, 529 U.S. 473, 483-84 (2000) (citing Barefoot v. Estelle, 463 U.S. 880, 893 (1983)).

In this case, the Court concludes that a certificate of appealability should not issue. Nothing suggests that the Tenth Circuit would find that this Court's application of AEDPA standards to the decision by the OCCA is debatable among jurists of reason. See <u>Dockins</u>, 374 F.3d at 938. The record is devoid of any authority suggesting that the Tenth Circuit Court of Appeals would resolve the issues in this case differently. A certificate of appealability shall be denied.

***CONCLUSION***

After careful review of the record in this case, the Court concludes that Petitioner has not established that he is in custody in violation of the Constitution or laws of the United States. Therefore, his petition for writ of habeas corpus shall be denied.

**ACCORDINGLY, IT IS HEREBY ORDERED** that:

1. The Court Clerk shall note on the record the substitution of Anita Trammell, Warden, in place of James Rudek, Warden, as party respondent.

2. The amended petition for writ of habeas corpus (Dkt. # 8) is **denied**.

3. The original petition for writ of habeas corpus (Dkt. # 1) is **declared moot**.

4. A certificate of appealability is **denied**.

5. A separate judgment shall be entered in this matter.

**DATED** this 12th day of August, 2014.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE